**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

KIPPY LEE FARMER,

     Plaintiff,

v.                                CIVIL ACTION NO. 2:21-cv-00035

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Kippy Lee Farmer ("Claimant" or "Plaintiff") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits, a period of disability, and supplemental social-security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on January 15, 2021, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's *Brief in Support of Appeal and Motion for Remand* (ECF No. 14), and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 15).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the

Commissioner's request to affirm her decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this civil action from the Court's docket.

## I.   BACKGROUND

### A.   Information about Claimant and Procedural History of Claim

Claimant was 32 years old at the time of his alleged disability onset date and 42 years old on the date of the decision by the Administrative Law Judge ("ALJ").  (Tr. 51.)[1] The Claimant graduated from high school, where he participated in special education classes and received average grades.  (Tr. 38-39, 226, 414.)  Most recently, he worked as a Laborer at a sawmill for nine years until his alleged disability onset in 2010; he has also been employed as a Water-Softener Installer, Grocery Clerk, and Stamping-Press Operator. (Tr. 38, 102, 413.)  Claimant alleges that he became disabled on September 1, 2010, due to "carpal tunnel; brain surgery on back of neck;" and "no balance." (Tr. 52, 71, 88-91, 218-21.)

In February 2019, Claimant protectively filed an application for a period-of-disability and disability-insurance benefits, as well as an application for supplemental-security income. (Tr. 218-27.) His claim was initially denied on June 27, 2019, and again upon reconsideration on September 20, 2019. (Tr. 86, 120.) Thereafter, on October 30, 2019, Claimant requested a hearing before an ALJ. (Tr. 169.) An administrative hearing was held before ALJ Francine A. Serafin on April 16, 2020; the hearing was conducted telephonically by agreement of the parties due to the Covid-19 pandemic. (Tr. 32-50.) On May 19, 2020, the ALJ rendered an unfavorable decision. (Tr. 10-21.) Subsequently, Claimant sought review of the ALJ's decision by the Appeals Council; however, the

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 5.

Council denied Claimant's request for review on November 25, 2020, and the ALJ's decision then became the Commissioner's final decision on that date. (Tr. 1-3, 214-16.)

Claimant timely brought the present action on January 14, 2021, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The Commissioner filed an Answer, along with a transcript of the administrative proceedings (ECF Nos. 4, 5). Claimant subsequently filed, by counsel, his *Brief in Support of Appeal and Motion for Remand*. (ECF No. 14.) In response, the Commissioner filed her *Brief in Support of Defendant's Decision*. (ECF No. 15.) As such, this matter is fully briefed and ripe for resolution.

## B. Relevant Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### i. MEDICAL EVIDENCE

On July 28, 2008, Claimant presented to neurosurgeon David L. Weinsweig, M.D., with complaints of headaches, neck pain, and some pain in his thoracolumbar region–all occurring over the previous six months to a year. (Tr. 337.) Dr. Weinsweig noted Claimant's medical history of brain surgery and "complete craniospinal neuraxial radiation" treatment to remove medulloblastoma, a cancerous tumor, with which he was diagnosed at the age of four. *Id.* Claimant denied any coordination problems or problems with his arms and legs, leading Dr. Weinsweig to note that "overall, he has done remarkably well" following his childhood cancer treatment. (Tr. 337; 423). Dr. Weinsweig also noted Claimant's past surgical history of bilateral carpal tunnel releases in 2003. (Tr. 337; *see also* Tr. 423.)

3

On examination, Dr. Weinsweig observed that Claimant's gait and tandem gait were normal; motor strength was grossly strong throughout the upper and lower extremities; sensation was intact, reflexes were equal, and there was no evidence of spasticity or myelopathy. (Tr. 337.) Brain and spine MRI and follow-up studies showed an intradural extramedullary lesion at C5-6, without evidence of diffuse metastasis. (Tr. 338.) Dr. Weinsweig diagnosed Claimant with possible recurrent cancer or other type of lesion, and at his recommendation Claimant elected a posterior cervical laminectomy at C5-8 to remove the lesion and relieve pressure on his spinal cord. *Id.* Subsequent cervical-spine imaging showed no evidence of a recurrent tumor, compression, or stenosis. (Tr. 339, 343, 350, 378.) The record does not indicate that Claimant had further complaints or treatment related to his cervical spine after the 2008 procedure.

In 2009, Claimant returned to Dr. Weinsweig with complaints of headaches and back pain. (Tr. 339.) On November 4, 2009, Dr. Weinsweig found that medical imaging indicated the signal in Claimant's spinal cord and vertebral marrow were normal; no Chiari malformation, acute bony abnormality or subluxation, abnormal enhancement, or recurrent tumor were observed; no cord-signal abnormalities were identified; and no significant cord compression was noted. (Tr. 339, 343.) Dr. Weinsweig concluded that there was "[n]o evidence for [a] recurrent tumor," and Claimant's examination was stable. (Tr. 340-41.) However, Dr. Weinsweig found a "broad-based disc bulge at the L4-L5 level, which [wa]s causing moderate left and moderate to severe right neural foraminal narrowing." (Tr. 340.) As "[t]he remaining levels [we]re unremarkable" and there was "no abnormal enhancement," Dr. Weinsweig's diagnosis was "persistent minimal subluxation L4 on L5, with associated disc bulge and neural foraminal compromise." (Tr. 340-41.) On March 7, 2010, Dr. Weinsweig ordered a sensory-

4

response evaluation of Claimant's upper and lower extremities to evaluate for any returning tumor in his spinal cord. (Tr. 335-36.) The findings "indicate[d] normal conduction in the central sensory pathways to the posterior tibial stimulation." (Tr. 336.) There is no indication on the record that Claimant sought or received treatment for pain during his treatment with Dr. Weinsweig.

On March 29, 2010, Claimant presented to Boone Memorial Hospital emergency room with "pain after injury at work" due to lifting. (Tr. 387-95.) Diagnostic x-rays of the lumbar spine indicated that Claimant did not have an acute fracture, but did present "decreased disc space height at L5-S1," as well as "sacralization of L5," which is a spinal irregularity of the fifth lumbar vertebra, associated with lower-back pain, posture control problems, and range-of-motion limitations. (Tr. 387-88.) Because sacralization can be congenital, the radiologist found that the decreased disc-space height "may be developmental rather than due to degenerative disc disease." (Tr. 387.) Finally, the radiologist noted that "3 mm anterior subluxation of L4 is noted on L5 with no other malalignment," which could be evaluated for possible "ligamentous instability." *Id.* Claimant was diagnosed with low back strain and prescribed Flexeril, a muscle relaxant used to treat pain and stiffness caused by muscle spasms. (Tr. 389-91.) A follow-up MRI on April 12, 2010 indicated a localized central disc protrusion at L4-5 as well as a mild bulging disc at L5-S1, but no acute fracture or high-grade spinal stenosis. (Tr. 393-96.)

On December 29, 2014, Claimant presented to the emergency room at Boone Memorial Hospital with complaints of back pain. (Tr. 398.) Thoracic spine x-rays "reveal[ed] mild to moderate degenerative changes at multiple levels," with "[n]o definite acute fracture or acute malalignment seen; Claimant was told to seek follow-up imaging if his back-pain symptoms persisted. *Id.* Following this 2014 treatment, the record does

not contain evidence of any relevant medical treatment Claimant subsequently sought or received before initiating his February 2019 claim.

## ii. *PHYSICAL CONSULTATIVE EXAMINATION*

Claimant underwent a consultative internal-medicine examination with family-medicine physician Stephen Nutter, M.D., on June 13, 2019. (Tr. 423-26.) Dr. Nutter wrote that Claimant "is a 41-year-old male claiming disability stating, 'my wrists.'" (Tr. 423.) Claimant reported "problems with joint pain in the wrists, shoulders, and knees," with intermittent joint pain for the previous five years. *Id.* He stated to Dr. Nutter that "walking, standing, kneeling, squatting and going up and down stairs increases the knee pain." *Id.* Dr. Nutter wrote that Claimant "has had x-rays on both wrists," followed by "bilateral carpal tunnel release in 2003." *Id.* Claimant told Dr. Nutter that his carpal tunnel surgery "helped for a while," but that his wrists "have gotten worse." (Tr. 423.) Claimant reported numbness and tingling in both hands and increased wrist pain with grasping, lifting, pushing, and pulling on objects; further, he reported that he has dropped things that he is holding onto "once or twice." (Tr. 423-25.) Dr. Nutter noted Claimant's statement that he had never had imaging of the joints performed; nor had he been treated with "joint injection or aspiration." *Id.*

Claimant also told Dr. Nutter that he had experienced "problems with back pain for 10 years," though he denied injury. (Tr. 424.) Claimant elaborated that he experienced "intermittent weekly pain in the upper and lower back," which was worsened by "[b]ending, sitting, lifting, and riding in a car." *Id.* His back pain did not radiate, and he denied neck pain. *Id.* Claimant stated that he was not prescribed or taking medications for any of these complaints, and did not have a treating physician.

Dr. Nutter's examination found that Claimant had a limited range of motion of the cervical spine, bilateral shoulders, and lumbar spine; right wrist tenderness; and an inability to squat or perform tandem gait adequately. (Tr. 424-26, 428). However, he noted that Claimant was able to "ambulate[] with a normal gait, which is not unsteady, lurching, or unpredictable, and did "not require the use of a handheld assistive device." (Tr. 424.) He "appear[ed] stable at station and comfortable in the supine and sitting positions." *Id.* Claimant exhibited no tenderness to percussion of the dorsolumbar spinous processes, nor tenderness of the cervical spine; had normal straight leg raise testing, normal muscle strength of the bilateral upper and lower extremities, and well-preserved sensory modalities; and could walk on heels and toes. (Tr. 425-26.) Additionally, Claimant had full (5/5) bilateral grip strength and he could make a fist bilaterally, write with his dominant right hand, and pick up coins with either hand without difficulty (Tr. 423-24.) Finally, lumbar spine x-ray imaging taken during the course of the examination revealed no acute findings. (Tr. 427-30.) Dr. Nutter diagnosed Claimant with degenerative arthritis, history of bilateral carpal tunnel syndrome, and chronic dorsolumbar strain. (Tr. 426.) He concluded, "The claimant is a 41-year-old male who complains of joint pain and back pain[;] [t]here were positive physical findings related to those complaints as documented in the above physical exam section." *Id.*

### iii.    NEUROPSYCHOLOGICAL CONSULTATIVE EXAMINATION

On May 20, 2019, Claimant underwent a neuropsychological consultative examination by clinical psychologist Lester Sargent, M.A. ("Sargent"); as part of Sargent's evaluation process, Sargent reviewed records followed by several assessments including a clinical interview, mental-status examination, and IQ test of the Claimant. (Tr. 412.)

During the clinical interview, Claimant stated that he is unable to work primarily due to memory impairment, which he attributed to his brain surgery; pain in his hands following carpal tunnel surgery; and chronic back pain. (Tr. 413.) He reported experiencing multiple cognitive deficits, presumed to be the result of his childhood brain surgery. *Id*. Claimant reported "a history of academic deficits and special education in school." *Id*. Claimant reported that he did graduate from high school, where he had participated in special education classes and achieved average grades. (Tr. 414.) He reported that he was not required to read and write or operate equipment during his work history. *Id*. He reported that he did not maintain a checking account, pay bills, or have a source of income. (Tr. 418.) He reported daily activities of watching television, running errands with his father, visiting close friends and family, and walking around outside for exercise, and occasionally playing video games. (Tr. 412, 418-19.) He also reported his ability to handle self-care independently, was able to keep scheduled appointments, and that he had a driver's license although his father drove him to the interview. (Tr. 412, 418-19.) No history for mental-health treatment was reported, and Sargent noted that Claimant did not have a primary-care provider and was not taking any medications. *Id*.

Sargent found that "current psychological testing reveals a mild decline in his overall level of cognitive functioning since he was tested in 2015 and 2011; Claimant was noted to have difficulty recalling previously-learned information, processing new information without making errors; performing tasks that assess short-term memory and concentration. (Tr. 413.) Sargent also found evidence of "mild psychomotor retardation and disturbance in executive functioning." *Id*.  Based upon the composite score derived from 10 subtest scores of the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), Sargent found that Claimant's general cognitive ability "is within the extremely low

range of intellectual functioning." (Tr. 414.) All of the subtest scores were either borderline or extremely-low range. (Tr. 414-15.) Sargent found that Claimant exhibited a slow pace and required occasional repetition of direction. (Tr. 416-18.) He further found that Claimant exhibited moderately impaired recent memory, and mildly deficient remote memory, concentration, and persistence. (Tr. 417-18.) There was also evidence of pain behaviors. (Tr. 417.) However, Sargent also found that Claimant had understandable and connected thought processes as well as normal immediate memory. (Tr. 417-18.) Based upon these factors, Sargent concluded that Claimant had mild neurocognitive disorder and somatic symptom disorder with predominant pain. (Tr. 418.)

### iv.   OPINION EVIDENCE

#### 1.   Physical Residual Functional Capacity Assessment by Brandy Vannatter, D.O.

Dr. Brandy Vannatter, D.O. ("Dr. Vannatter"), a physician who reviewed Claimant's medical records and examined Claimant but did not treat him for any of his alleged physical or mental impairments, also completed a "Physical Residual Functional Capacity Assessment" form at Claimant's request. (Tr. 400.) In this January 15, 2019 assessment, Dr. Vannatter opined that Claimant's "impairments are severe and would adversely affect [his] ability to maintain employment at any job on a sustained basis." *Id*. She described his primary diagnoses as "bilateral carpal tunnel syndrome, brain cancer resection, cervical spine mass with cord compression, headaches, and depression." (Tr. 401.)

Dr. Vannatter included with her report a "Purdue Pegboard Score Sheet" form which set forth Claimants' results from Dr. Vannatter's administration of the Purdue

Pegboard test.[2] (Tr. 408.) Dr. Vannatter indicated on the form that she administered the Purdue Pegboard test to Claimant three times and used the average of the three tests to score Claimant's results. Calculating the averages for each subset based upon the three test rounds, Dr. Vannatter found that Claimant's average scores were as follows: 11 with his right hand, 8.33 with his left hand, 13 with both hands, and 18.33 on "assembly."[3] (Tr. 408.) Dr. Vannatter also indicated on the form that Claimant experienced numbness with the exam. (Tr. 408.)

Rating Claimant's exertional limitations, Dr. Vannatter indicated that Claimant could occasionally and frequently lift and carry fewer than ten pounds; could stand and/or walk, with normal breaks, for a total of less than 2 hours in an 8-hour workday; and sit, with normal breaks, for a total of less than about 6 hours in an 8-hour workday. (Tr. 402.) Additionally, she limited Claimant's ability to push and/or pull, including operation of hand and/or foot controls, in the upper and lower extremities. *Id.* In support of these

---

[2] The Court takes judicial notice that the "Purdue Pegboard" test consists of a pegboard with two vertical rows of 25 small holes down its center; it is administered in a series of four subtests, where the subject is directed to place certain objects in the pegboard holes within specified periods of time in order to measure the coordination and motor skills of the subject's fingers, hands, and arms. *See* Katie Marvin, MSc.PT, *Purdue Pegboard Test (PPT)*, Canadian Partnership for Stroke Recovery (Jun. 9, 2012), *available at* https://strokengine.ca/en/assessments/purdue-pegboard-test-ppt/ [hereinafter the "Marvin Article"]; J. Tiffin & E. J. Asher, *The Purdue Pegboard: norms and studies of reliability and validity*, 32 J. Applied Psychol. 221, 234-47 (Jun. 1948). In the first subtest, the subject uses his or her right hand to place as many cylindrical dowels called "pins" as possible down on the right row within 30 seconds; similarly, in the second subtest, the subject uses his or her left hand to place as many pins as possible down on the left row within 30 seconds. *See id.* Third, the subject uses both hands simultaneously to place as many pins as possible down both rows. *See id.* In the fourth and final "assembly" subtest, the subject uses both hands to place a specified assembly of pins, washers, and a hollow cylinder "collar" into as many pegboard holes as possible down both rows within sixty seconds. *See id.* The goal of this test is to determine the subject's competence in completing a task or job that requires manual dexterity. *See id.*

[3] The significance of these scores is not readily apparent from the face of Dr. Vannatter's form, which included but did not refer to Claimant's results in relation to a "quick reference" table taken from the Appendix in the original 1968 Purdue Pegboard Manual that set forth "normative population averages" for different occupational areas such as general factory work and assembly jobs. (Tr. 408.) Looking at the range of averages for each of the occupational areas on the table, however, it is apparent that each of the subset scores were below the manual's average range with the exception of the score for both hands, which was normal. *Id.*

limitations, Dr. Vannatter pointed to Claimant's "cervical spine tumor resulting in cord compression with radicular symptoms and carpal tunnel," and stated that Claimant's symptoms were consistent with medical-imaging and physical examination. *Id.* Dr. Vannatter also indicated that he could occasionally climb ramps and stairs, kneel, and crouch, but never climb ladders, ropes, or scaffolds, balance, stoop, or crawl. (Tr. 403.) As explanation for these findings, Dr. Vannatter wrote that Claimant's symptoms and limitations were "consistent with physical exam which shows difficulty with balance." *Id.*

Rating Claimant's manipulative limitations, Dr. Vannatter indicated that Claimant was limited in his abilities to reach, handle, finger, and feel. (Tr. 404.) She wrote that Claimant was "limited in reaching, fingering and handling to occasional only[, and] [r]eaching is limited in all directions which is supported by both physical exam, medical evidence and P[u]rdue Pegboard exam," the latter of which is an indicator of fine motor speed and dexterity of the dominant hand, non-dominant hand, and both hands simultaneously. *Id.* Dr. Vannatter did not check the boxes on the form to indicate that Claimant had visual or communicative limitations, but did write that "Patient [had] visual limitations but [they were] not tested by me." *Id.*

Rating Claimant's environmental limitations, Dr. Vannatter indicated that Claimant should avoid even moderate exposure to extreme heat, and should avoid all exposure to extreme cold, vibration, and hazards.  (Tr. 405.) She wrote that Claimant's "history of neuropathy which causes difficulty with balance limits all the above environmental factors which could result in injury or worsening of [his] symptoms." *Id.*

Finally, Dr. Vannatter wrote that Claimant's symptoms "are attributed to a medically determinable impairment which is supported by medical evidence," and that Claimant met the "medical listing from [his] spinal tumor which resulted in cord

compression which is characterized by pain, limited range of motion, weakness and neuropathy." (Tr. 406.)

       2.    *State-Agency Physical Residual Functional Capacity Assessment*

State-agency physician Narendra Parikshak, M.D. completed a physical Residual Functional Capacity ("RFC") Assessment of Claimant on June 27, 2019. (Tr. 61.) First, Dr. Parikshak found that Claimant's medical records were insufficient to evaluate his RFC on the date he was last insured; turning to Claimant's "current" RFC at the time of her evaluation, however, Dr. Parikshak found that Claimant had exertional limitations, including only occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; standing and/or walking, with normal breaks, for about six hours in an eight-hour workday. (Tr. 61.) Based on Claimant's tandem-gait and balance limitations, limited lumbar forward-flexion, as well as his history of spinal and brain surgeries, Dr. Parikshak found that his RFC had postural limitations, including climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling, only occasionally—and never climbing ropes, ladders, or scaffolds. (Tr. 61-62.) Finally, Dr. Parikshak found that Claimant had environmental limitations, including avoiding concentrated exposure to extreme cold, avoiding concentrated exposure to vibration, avoiding even moderate exposure to hazards such as machinery and heights. (Tr. 62.) Thus, Dr. Parikshak concluded that Claimant's physical symptoms and severity were partially consistent with the medical records; however, she found that additional limitations were not warranted based upon record evidence of Claimant's normal gait, strength and lack of atrophy. *Id.* Additionally, imaging of Claimant's spine was unremarkable, a Tinel's test was negative

for nerve compression or damage with a preserved grip strength, and his straight-leg raise was normal. *Id.*

> 3. State-Agency Mental Residual Functional Capacity Assessment

As to Claimant's mental-health issues, John Todd, Ph.D., completed a Mental RFC Assessment and found that Claimant was "markedly limited" in his ability to understand, remember, and carry out detailed instructions, but could respond to simple one-step or two-step verbal instructions. (Tr. 63-64.) With respect to Claimant's adaptation limitations, Dr. Todd found that Claimant was "moderately limited" in his ability to respond appropriately to changes in the work setting as well as the ability to travel in unfamiliar places or use transportation. (Tr. 64.) Dr. Todd also found that Claimant was "moderately limited" in the ability to set realistic goals or make plans independently of others, requiring plans and goals to be set by others and additional time given to learn new tasks. (Tr. 64.) Jeff Harlow, Ph.D., affirmed Dr. Todd's assessment several months later. (Tr. 98.)

Finally, State-agency psychiatric expert, H. Hoback Clark, M.D., also completed an RFC Assessment and similarly found that Claimant could understand and follow simple instructions, sustain routine work tasks, focus on and carry out simple tasks in two-hour increments, and adapt to minimal changes. (Tr. 118.)

> v. HEARING TESTIMONY

An administrative hearing was held telephonically before ALJ Francine A. Serafin on April 16, 2020. (Tr. 32-50.) Claimant's counsel presented opening and closing argument, and the ALJ heard testimony from Claimant as well as from vocational expert Cecilia Thomas (the "VE").

Claimant testified that he was placed in special education classes for the entirety of his primary and secondary schooling, and he is not able to read "real well." (Tr. 38-39.) Following secondary school, he generally worked as a laborer for a variety of jobs, all of which required him to do heavy lifting. (Tr. 38-39.) He most recently worked at a sawmill in approximately 2010 or 2011, where he performed heavy manual labor. (Tr. 38.) Claimant further testified that none of his past jobs required him to follow written directions or read anything. (Tr. 38-39.) He testified that he has trouble remembering and following directions, even if given orally. (Tr. 41-42.) Claimant testified that he was currently experiencing pain, including back pain; pain starting in his wrist and radiating all the way up his arm; numbness in his hands along with difficulty grasping and hanging on to objects; and difficulty both with reaching his arms and rotating his back, in all directions. (Tr. 39-41.) Further, Claimant testified that he has experienced problems with balance his entire life, including sudden, periodic dizzy spells that recur approximately once per week and last at least 30-40 minutes. (Tr. 41.) Claimant testified that he stopped working when he was unable to perform heavy manual labor because of his back pain, arm pain, and numbness in his hands, which has gone on since he last worked. (Tr. 42.)

After Claimant's testimony, the VE testified. (Tr. 43.) Claimant's counsel did not object, and "recognize[d] her as an expert." *Id.* Relevant to Claimant's ability to perform past work, the ALJ then questioned the VE whether, based upon her review of the record, she had information to classify Claimant's past work. *Id.* The VE testified in response to the ALJ's question that Claimant's past work constituted medium to very-heavy unskilled labor. (Tr. 43-44.)

Relevant to the ALJ's determination of Claimant's RFC, the ALJ then asked the VE to provide her opinion in response to three hypothetical questions. *See id.* Each of the

three questions sought to evoke the VE's opinion regarding a *theoretical* person's ability to work [hereinafter referred to as "Mr. Theoretical"]. In each of the three hypothetical scenarios, the ALJ asked the VE to assume that Mr. Theoretical shared the same age, education and work history as Claimant; the only difference in each hypothetical was whether Mr. Theoretical had or did not have various sets of the physical limitations asserted by the Claimant.

The ALJ's first hypothetical to the VE asked her to assume—in addition to the assumption that Mr. Theoretical shared the same age, education and work history as Claimant—that Mr. Theoretical would be capable of performing work at the light exertional level, but this light-work capability would be subject to five main limitations. (Tr. 44-45.) First, Mr. Theoretical could engage in frequent fingering, handling and feeling, but with the right upper extremity only; second, he could occasionally climb ramps and stairs; balance, stoop, kneel, crouch and crawl; third, he would need to avoid frequent exposure to extreme cold, vibration, and also workplace hazards such as moving machinery or unprotected heights; fourth, he would be limited to simple, routine, repetitive tasks with only simple instructions; fifth, he could handle minimal changes (three to four per workday or work shift) in the work setting; and sixth, he could never climb ladders, ropes, and scaffolds, or walk on uneven terrain. *Id.*

The VE testified in response to the ALJ's first hypothetical that Mr. Theoretical would not be able to perform Claimant's past work; however, she further testified that there are other jobs in the national economy that Mr. Theoretical could perform, including cafeteria attendant, housekeeping, and inspecting and sorting. (Tr. 44-46.)

The ALJ's second hypothetical to the VE asked her to assume that Mr. Theoretical had exactly the same characteristics as the previous hypothetical, but with one

modification. (Tr. 46.) Specifically, the ALJ asked the VE to assume that Mr. Theoretical's limitation for fingering, handling, and feeling with the right upper extremity was further limited from *frequent*, to only *occasional* or *less than occasional*. *Id*. The VE testified in response to the ALJ's second hypothetical that Mr. Theoretical "would not be able to meet any standards set by an employer as far as performance" and "could very likely result in a person losing a job" even if they were able to obtain work. (Tr. 46.)

The ALJ's third and final hypothetical asked the VE to forget the previous two assumptions and this time assume only that Mr. Theoretical would be off-task for 15% or more of a workday in a regular, eight-hour workday. (Tr. 47.) Under this assumption, the ALJ asked the VE to consider an employer's tolerance for off-task time, specifically, what impact Mr. Theoretical's 15% off-task time would have on the type of job that he could perform. *Id*. The VE testified in response to the ALJ's third hypothetical that Mr. Theoretical's problem with staying on-task for 15% or more of a regular, eight-hour workday would be work preclusive. (Tr. 47.)

Finally, Claimant's counsel asked the VE to provide her opinion in response to one hypothetical question. Directing her back to the ALJ's second hypothetical, counsel asked the VE to assume that Mr. Theoretical's limitation for "reaching, fingering, and handling would be limited to occasional only *in all directions*." (Tr. 47.) The VE testified in response to counsel's hypothetical that such a limitation would eliminate all the work Mr. Theoretical could perform. *Id*.

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

16

than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). To establish eligibility for benefits, the claimant has the ultimate burden to prove that he or she—as applicable—is disabled, had a period of disability, and/or became disabled before the claimant's date last insured. *Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985); *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012).

The Social Security Administration established a five-step sequential evaluation process to aid the ALJ in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled." If no conclusive finding is made at one of these steps, the analysis advances on to the next step in the sequence. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At the first step in the sequential evaluation process, the ALJ must determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically-determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that [he or she] is impaired if [the claimant] can show that [his or her] condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects his or her "ability to perform work despite [the claimant's] limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect [his or her] ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To make this RFC assessment, the ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," then "define the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment."  *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities."  *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If not, then "the ALJ proceeds to step five."  *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether the claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert

responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him or her to be "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the Claimant cannot perform other work, the ALJ will find him or her to be "disabled." *Id.*

Applying the sequential evaluation process in this case, at step one the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date of September 1, 2010. (Tr. 12.) Accordingly, the ALJ proceeded to step two. At the second step, the ALJ found that Claimant had seven (7) "severe" medically-determinable[4] impairments: (1) history of medulloblastoma surgery at age 4 with complaints of headaches; (2) history of surgery to remove cervical spine tumor; (3) carpal tunnel syndrome with history of bilateral release; (4) degenerative disc disease of the lumbar, thoracic, and cervical spine; (5) arthritis; (6) neurocognitive disorder; and (7) somatic disorder. (Tr. 13.) Further, the ALJ found that these impairments "significantly limit" Claimant's "ability to perform basic work activities as required by SSR 85-28." (Tr. 13.)

However, at the third step, the ALJ found that neither the seven severe impairments, nor a combination thereof, met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13.) Because the first three steps did not lead to a conclusive determination, therefore, the ALJ's next task was to assess Claimant's RFC. Upon assessing Claimant's RFC, the ALJ determined that Claimant is able to perform light work as defined in C.F.R. §§ 404.1567(b) and 416.967(b), except he can "never climb ladders, ropes, or scaffolds and occasionally climb ramps and

---

[4] The ALJ acknowledged that Claimant "complained of anxiety and sadness," but because of a lack of any "diagnosis of anxiety or depression in the record since [Claimant's] alleged onset date," the ALJ found that neither anxiety nor depression satisfied the standard for medically-determinable impairments under the circumstances. (Tr. 13.)

stairs, balance, stoop, kneel, crouch, and crawl." (Tr. 15.) The ALJ found Claimant was "incapable of walking on uneven terrain," and though she found Claimant was able to frequently finger, handle, and feel, she limited those activities to the right upper extremity *Id*. Further, she found that Clamant "must avoid frequent exposure to extreme cold, vibration, and workplace hazards such as moving machinery and unprotected heights," and was "limited to simple, routine repetitive tasks with only simple instructions." *Id*. Finally, the ALJ found that Claimant could "handle minimal changes in work setting defined as three changes per workday or work shift." *Id*.

Based upon the limitation to light exertion, the ALJ determined that Claimant was unable to perform his past relevant work, all of which involved medium to very heavy exertion. (Tr. 19-20.) She found that Claimant was "a younger individual" on the disability-onset date, that he "has at least a high-school education and is able to communicate in English," and that "[t]ransferability of job skills is not an issue in this case because [the Claimant's] past relevant work is unskilled." (Tr. 20.) Because the ALJ determined that Claimant was unable to perform the full range of light work, she enlisted the testimony of the VE to aid in finding that Claimant is capable of working as a cafeteria attendant, a cleaner/housekeeper, or inspector/sorter. *Id*. As a result, the ALJ concluded that Claimant "has not been under a disability . . . from September 1, 2010 [the disability-onset date] through the date of this decision" within the scope of 20 C.F.R. §§ 404.1520(g), 416.920(g). (Tr. 21.)

## II.   <u>LEGAL STANDARD</u>

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the Commissioner [here, represented by the decision of the ALJ] if they are supported by substantial evidence and

were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.*

In reviewing the record for substantial evidence, the Court's role is not to re-weigh conflicting evidence, make credibility determinations, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the ALJ. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Rather, the Court's task is to ensure that the ALJ made reasonable and supportable inferences after carefully considering the evidence—including all the relevant medical evidence—and explained her conclusions—without ignoring conflicting evidence. *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 98 (4th Cir. 2020); *McCall v. Apfel*, 47 F. Supp. 2d 723, 731 (S.D. W. Va. 1999). To demonstrate compliance with this standard, the ALJ's decision must "build an accurate and logical bridge from the evidence to [the ALJ']s conclusion," including an explanation for the ALJ's decision to give less weight to evidence that conflicts with her conclusion. *Id.* at 100. The Court must uphold the ALJ's decision if it meets this standard, even if "reasonable minds [could] differ as to whether a claimant is disabled." *Craig*, 76 F.3d at 589.

## III.   ANALYSIS

As discussed below, Claimant's brief merely consists of numerous conclusory statements. (*See* ECF No. 10-2.) Construing these arguments liberally, however, Claimant

appears to assert three main issues: (1) whether the ALJ's decision is supported by substantial evidence; (2) whether the ALJ erred by not affording proper weight to the opinion of Brandy Vanatter, D.O.; and (3) whether the ALJ erred by not following the applicable regulations in evaluating the evidence as a whole and when assessing Claimant's physical and mental impairments. *Id.* at 2-7. Claimant asks the Court to "set aside" and "reverse the order that denied this claim for disability benefits and SSI benefits," or alternatively "that this claim be reversed and[] remanded for an administrative hearing which addresses the issues and errors identified herein, including the effect of the claimant's limitations in balancing, bending, reaching, handling, and fingering." (ECF No. 10-2 at 1, 18.) The Commissioner responds that the ALJ's decision is supported by substantial evidence, which she appropriately evaluated and explained. (ECF No. 15.) The Commissioner challenges Claimant's suit as an improper attempt to elicit different credibility determinations, reweigh the evidence, and displace the ALJ's judgment to achieve a different outcome. *Id.* at 2. Further, the Commissioner argues that, by failing to tether conclusory statements to supporting legal authority and specific facts on the record, the undeveloped arguments in Claimant's brief are so fundamentally inadequate that he has effectively waived his claims on appeal. (ECF No. 15 at 8-9.)

A claimant's argument is so fundamentally inadequate as to warrant a finding that he has waived his claims against the Commissioner when "his entire discussion" of an issue "is limited to several pages of [regurgitated] legal standards and a few vague references to [the claimant's] testimony and medical records," such that it is not fairly presented to the district court. *Pawlowski v. Comm'r. of Soc. Sec.,* 13–cv–11445, 2014 WL 3767836 at *5 (E.D.Mich. July 31, 2014). It is well-settled that a claimant "cannot simply make the claim that the ALJ committed error, while leaving it to the Court to scour . . . or

to wade through and search the entire record for some specific facts that might support" his or her argument. *McPhillips v. Comm'r of Soc. Sec.*, 13-CV-13557, 2014 WL 5092884, at *7 (E.D. Mich. Oct. 10, 2014). As Judge Richard Posner's oft-repeated aphorism posits, federal judges "are not like pigs, hunting for truffles" buried in the record. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), *quoted with approval by, e.g., Christian v. Cook Inc.*, 2:13-CV-20841, 2015 WL 3557242, at *2 (S.D. W. Va. June 4, 2015); *Kraim v. Virginia*, 3:21-CV-326, 2021 WL 3612305, at *3 (S.D. W. Va. July 26, 2021), *report and recommendation adopted*, 2021 WL 3610509 (S.D. W. Va. Aug. 13, 2021). *See also Cooper v. City of Charleston*, 624 S.E.2d 716, 727 (W. Va. 2005).

Nor is the Court "obligated to make plaintiff's case for them." *McPhillips*, 2014 WL 5092884, at *6. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting out of hand a conclusory assertion that the ALJ failed to consider whether the claimant met the listings, because the claimant provided no analysis of relevant law or facts regarding the listings; *Lobos v. Colvin*, 15-cv-5007, 2016 WL 8710077, at *5 (W.D. Ark. Apr. 1, 2016), *report and recommendation adopted*, 2016 WL 3523740 (W.D. Ark. June 22, 2016) ("Plaintiff does not address any medical evidence to support his position or meaningfully argue this point in his brief, and the Court therefore finds Plaintiff has waived this argument").

Even if the Claimant were not represented by counsel in this matter, and therefore was afforded the liberal construction and less stringent standard to which *pro se* litigants are held, the brief at issue is still so fundamentally inadequate that a finding that he has waived his claims against the Commissioner would still be warranted under the circumstances. Even though this standard may produce harsh results for claimants, its rationale is supported by the same guiding principles the Fourth Circuit employs when

considering on appeal "the difficult problems raised when *pro se* litigants only vaguely identify potential legal issues in the controversy at hand." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1276 (4th Cir. 1985). In those circumstances, the Fourth Circuit must balance the interest of protecting *pro se* litigants who "cannot, of course be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law," against the judicial system's efficiency interest in protecting trial courts from the burden of "conjur[ing] up and decid[ing] issues never fairly presented to them." *Id.* at 1276. The Fourth Circuit acknowledged that the imbalance caused by failing to consider the latter interest of the trial court would not only improperly "strain judicial resources by requiring those courts to explore exhaustively all potential claims of a *pro se* plaintiff, but would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Id.* at 1278.

Here, the undersigned notes that Claimant is represented by counsel of record in this matter, who submitted the subject brief on Claimant's behalf. (*See* ECF No. 14.) Logically, if even the liberal protections afforded to *pro se* claimants have limits as discussed above, then by extension, the trial-court protection illustrated by the Fourth Circuit is particularly apt when a plaintiff is represented by counsel. *See Beaudett*, 775 F.2d at 1276.[5] However the undersigned, having reviewed the parties' submissions in this

---

[5] Mirroring a district court's observation regarding another attorney, here the undersigned expresses frank "concern with the work product of Plaintiff's counsel," whose "reliance on conclusory assertions and absence of developed argument has become the calling card of . . . counsel in a number of recent Social Security cases." *Fielder v. Comm'r of Soc. Sec.*, 13-cv-10325, at *1 n.1 (E.D. Mich. Mar. 24, 2014). Like the *Fielder* court, in this case the undersigned instructs Claimant's counsel to ensure that future filings before this Court "advance properly supported arguments that rest upon (and cite to) the facts of a particular case" and tether those facts to an analysis—rather than a regurgitation—of applicable law. *See id.*

matter, finds that even under the liberal construction and less stringent standards afforded to *pro se* filings,[6] Claimant's "arguments" in support of his appeal consist solely of conclusory statements, devoid of any analysis—let alone a meaningful analysis—of the facts and law, rendering them so fundamentally inadequate that a finding of waiver is warranted. *See Vandenboom*, 421 F.3d at 750; *Lobos*, 2016 WL 8710077, at *5.

Like the *Pawlowski* case, where the Commissioner's decision was affirmed on the basis of waiver, here Claimant's discussion is essentially "limited to several pages of [regurgitated] legal standards and a few vague references to [the Claimant's] testimony and medical records," such that it is not fairly presented to the district court." *Pawlowski*, 2014 WL 3767836 at *5.

First, the "facts" section of Claimant's brief, which is comprised of about 250 words, contains no citations to the record aside from the ALJ's Decision itself. (ECF No. 10-2 at 1-2.) Instead, Claimant makes "a few vague references" to the evidence, such as the statements that he "testified and the record confirms that he has difficulty with his balance and with his vision" and "further suffers from multiple disc lesions (herniations) in his lumbar spine that were confirmed by MRI in 2008 and 2009." *Id.* at 2.

Following the "facts" section, Claimant's brief next sets forth fifteen numbered paragraphs, each of which are made up of a few sparse, unsupported sentences that generally allege an "assignment of error" made by the ALJ. (ECF No. 10-2 at 2-7.) For example, the tenth numbered paragraph "assigns as error" the ALJ's alleged failure "to give proper weight to results of the Purdue Pegboard Test administered by Dr. Vannatter,

---

[6] *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (explaining that generally, "[a] document filed *pro se* is to be liberally construed"); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (liberally construing whether a *pro se* party's complaint stated a cognizable claim on the grounds that, "however inartfully pleaded, [a *pro se* pleading] must be held to 'less stringent standards than formal pleadings drafted by lawyers").

where the test was stated to be valid and where there is no other evidence of manual dexterity testing." *Id.* at 6. This statement does not cite to the record or otherwise address the manner in which, or by whom, the "test was stated to be valid." *See id.*

The next section, titled "the law involved," asserts the general statement that "[h]ere, the ALJ did not follow the established procedures when evaluating the evidence, nor did she explain why she failed to follow the established procedures." *Id.* at 7. This statement is followed by ten pages of block quotes copied and pasted[7] directly from portions of the Social Security Administration's regulations relating to Title II and Title XVI of the Social Security Act—with no accompanying annotations, comments, or context. (*See* ECF No. 10-2 at 7-17 (quoting from 20 C.F.R. §§ 404.1569a, 416.920a, and 416.927).)

Finally, on the last page of Claimant's brief, a 73-word "argument" section merely states the following:

> The ALJ failed to properly evaluate the evidence in accordance with mandated procedures. She failed to properly consider objective evidence of impairment that was supported by test results and reasoned medical opinions of evaluating doctors. She also failed to explain why she did not consider that objective evidence and why she then gave controlling weight to the opinions of reviewing doctors, who stated that they had insufficient evidence to reach a conclusion.

ECF No. 10-2 at 18.) On its face, Claimant's cursory "argument" is improperly comprised solely of conclusory and unsupported statements. (ECF No. 10-2 at 18.)

Further, Claimant's brief failed to comply with the form requirement for briefs pursuant to Rule 9.4(b) of the Court's Local Rules of Civil Procedure. Specifically, the Rule requires a claimant's brief to "contain a statement of issues, a statement of the facts, and an argument *on each issue asserted.*" L.R. Civ. P. 9.4(b) (emphasis added). Claimant's 73-

---

[7] The undersigned notes that the portion of Claimant's brief that sets forth these extensive block quotes is in a lighter-colored font, with blue hyperlinks observable for regulatory citations—both indications that the text was simply copied and pasted from an electronic source without modification.

word argument clearly fails to meet this standard. Even if the fifteen numbered paragraphs titled "assignment of error" could be liberally construed as an "argument," this would still fall short of the standard, as the Rule further specifies that "[t]he argument on each issue shall identify the findings which are alleged not to be supported by substantial evidence, and other errors which are alleged to have been made, *with citations to the pertinent transcript pages and to relevant regulations, rulings, and cases.*" *Id.* (emphasis added). As set forth above, Claimant's brief contained no citations to the record other than the ALJ's decision. (*See* ECF No. 10-2.)

In sum, Claimant's submission—wholly devoid of any "meaningful argument" with respect to each of the fifteen counts of error that were generally alleged, and "limited to several pages of [regurgitated] legal standards and a few vague references to [the Claimant's] testimony and medical records"—is so fundamentally inadequate that it cannot be said to have been "fairly presented" to the Court. *See Pawlowski*, 2014 WL 3767836 at *5; *Lobos*, 2016 WL 8710077, at *5. Claimant's fifteen conclusory assertions that the ALJ erred, unsupported by any analysis of the relevant law or facts, improperly seeks to oblige the Court to root through the record and make Claimant's case for him. *McPhillips*, 2014 WL 5092884, at *6; *Vandenboom*, 421 F.3d at 750. As the Fourth Circuit observed, such an exercise would waste judicial resources and "transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Beaudett*, 775 F.2d at 1278. Moreover, the Court's efficiency interest particularly outweighs Claimant's need for protection under the circumstances because, unlike the pro se litigant in *Beaudett*—who the Fourth Circuit found could "not, of course be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law," here Claimant is

represented by counsel who is duty-bound to do so. Id. A determination that Claimant's brief is so fundamentally inadequate that he has waived his claims against the Commissioner—though a harsh finding—is therefore appropriate under the circumstances.

Additional circumstances relating to Claimant's counsel contribute to the appropriateness of a finding of waiver in this action. This Court's Local Rules of Civil Procedure require a claimant to "file and serve a brief in support of the complaint no later than 30 days after the date of service of the certified . . . administrative transcript." L.R. Civ. P. 9.4(a). In this case, the Commissioner filed and served the transcript on June 14, 2021. (ECF No. 5.) Claimant's brief in support of his Complaint, therefore, was originally due on July 14, 2021. L.R. Civ. P. 9.4(a). However, Claimant failed to file a timely brief; subsequently, the undersigned entered an Order *sua sponte* extending Claimant's deadline to submit his brief to July 30, 2021. (ECF No. 6.) The Order specifically warned Claimant "that his failure to submit his brief in support of the complaint . . . will result in the undersigned's recommendation that this action be dismissed for failure to prosecute." *Id*. Again, however, Claimant failed to file a timely brief and the undersigned recommended dismissal on August 6, 2021. (ECF No. 7.)

On August 20, 2021, Claimant moved for a fifteen-day extension of time to object to the undersigned's dismissal recommendation, on the grounds that "a critical member of the Social Security staff . . . test[ed] positive for Covid-19" which resulted in closure of the office. (ECF No. 8.) The presiding District Judge granted the extension and ordered Claimant to file any objections no later than September 6, 2021. (ECF No. 9.) The District Judge noted, however, the following:

> The Court notes that the PF&R recommends dismissal for failure to prosecute because the Plaintiff failed to file a brief in support of the complaint by the July 14, 2021 deadline and failed to respond to an order warning that dismissal would be recommended absent a response by July 30, 2021. While the Court has found that a COVID-19 outbreak within the law office directly impacting a vital staff member constitutes good cause for an extension, the history of lack of responsiveness by counsel is quite concerning.

*Id.* at 1 n.1. Claimant's counsel filed his Objections on September 7, 2021—one day after the District Judge's deadline; therein, he indicated that he overlooked the applicable deadlines due to office closures and quarantines for COVID-19 infections, and during some periods lacked access to the transcript. (*See* ECF No. 10.) Claimant's subject *Brief in Support of Appeal and Motion for Remand* was attached to this filing. (ECF No. 10-2.) As the Commissioner did not object to Claimant's late filing, the District Judge permitted the filing of Claimant's brief, noting that, "[w]hile counsel should have monitored deadlines and timely sought any extensions necessitated by the COVID cases within his law office, the pandemic has created disruptions" that sufficiently supported good cause. (ECF No. 13 at 2.)

Counsel filed Claimant's brief nearly ninety days after the Commissioner made the administrative transcript available. In light of the District Judge's generous extensions of time, and considering all the surrounding circumstances, the failure of counsel to submit a brief that complied with even the basic form requirements of Local Rule 9.4(b) is particularly egregious. Accordingly, the undersigned **FINDS** that Claimant's arguments were waived by his counsel.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's

decision (ECF No. 14), **GRANT** the Commissioner's request to affirm her decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this civil action from the Court's docket.

Alternatively, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** the parties' pending motions without prejudice; **ORDER** Claimant to file, within thirty (30) days, a renewed brief in support of appeal, with the Commissioner's brief due thirty (30) days thereafter; and **NOTIFY** Claimant that continued failure to submit a timely brief in compliance with Rule 9.4(b) of the Court's Local Rules of Civil Procedure—advancing arguments which analyze, rest upon, and cite to specific legal authority and  facts of record—shall result in dismissal of this action.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record and to any unrepresented party.

ENTER: August 15, 2022

Dwane L. Tinsley
United States Magistrate Judge